UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CURTIS WARREN DAWKINS,

                Petitioner,              Case No. 1:09-cv-555

v.                                   Honorable Paul L. Maloney

MARY BERGHUIS,

                Respondent.

_____

## **OPINION**

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.
§ 2254.  Promptly after the filing of a petition for habeas corpus, the Court must undertake a
preliminary review of the petition to determine whether "it plainly appears from the face of the
petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court."
Rule 4, RULES GOVERNING § 2254 CASES; *see* 28 U.S.C. § 2243.  If so, the petition must be
summarily dismissed.  Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court
has the duty to "screen out" petitions that lack merit on their face).  A dismissal under Rule 4
includes those petitions which raise legally frivolous claims, as well as those containing factual
allegations that are palpably incredible or false.  *Carson v. Burke*, 178 F.3d 434, 436-37 (6th Cir.
1999).  After undertaking the review required by Rule 4, the Court concludes that the petition must
be dismissed because it fails to raise a meritorious federal claim.

Petitioner is incarcerated in the E.C. Brooks Correctional Facility. He was convicted in the Kalamazoo County Circuit Court of first-degree felony murder, MICH. COMP. LAWS § 750.316(1)(b); assault with a dangerous weapon, MICH. COMP. LAWS § 750.82(1); discharge of a firearm in a building, MICH. COMP. LAWS § 750.234b(1); and six counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b(1). The trial court sentenced him on July 26, 2005, to a prison term of life without the possibility of parole for the murder conviction, and a concurrent term of fourteen to forty-eight months for the assault and discharge of a firearm in a building convictions, to be served following consecutive prison terms of two years for each of the felony-firearm convictions.

In his *pro se* petition, Petitioner raises five grounds for relief, as follows:

I.  Petitioner was denied due process of law and equal protection of the law as guaranteed by the United States Constitution's Fourteenth Amendment because the trial court improperly denied his request for jury instructions on voluntary manslaughter as a lesser included offense of murder as provided and required by Michigan law.

II. The [Petitioner] was denied the effective assistance of counsel in violation of the United States Constitution's Sixth Amendment by his attorney's error in failing to request a jury instruction on second-degree murder as a necessarily included offense of felony murder and instead allowed without objection a jury instruction that suggested that felony-murder was a lesser included offense of second-degree murder rather than the reverse.

III. The [Petitioner] was deprived of a fair trial by plain error on the felony-murder charge by the introduction of the defendant's statement to police that he must have been going to rob the victim, because that statement was the sole evidence that the homicide occurred during an attempted larceny . . . , and therefore the *corpus delicti* rule . . . was not satisfied.

IV. The [Petitioner] was denied due process of law under the United States Constitution's Fourteenth Amendment by the charge to the jury, and by his conviction, on the felony-murder count because the sole evidence to support the charge was his statement to police that he must have been going to rob the victim.

V. Petitioner's Sixth and Fourteenth Amendment rights, respectively, to be confronted with the witness against him, and to effective assistance of counsel, and to due process of law were violated, because the dvd that contained petitioner's statement to police during interrogation [in which petitioner stated] that he must have been trying to rob the victim was not presented to the jury as evidence during the presentation-of-evidence portion of the trial but instead was played for the jury only during the jury's deliberations . . . .

(Pet., 6-13.)

## Procedural History

### A. Trial Court Proceedings

The charges against Petitioner arose from events that occurred during the early morning hours of November 1, 2004, at the residence located at 431 W. Walnut Street in the City of Kalamazoo. Petitioner was charged with murdering Thomas Bowman under alternative theories of premeditated murder and felony-murder (murder committed in the course of an attempted larceny); assaulting Jarrod Keeler with a deadly weapon; assaulting with intent to murder Christopher Bradley, Freddie Smith, and James Honz; and discharging a firearm in a dwelling. In addition, Petitioner was charged with a separate count of felony-firearm for each of the above felony charges. The following statement of facts is taken from Petitioner's brief filed in the Michigan Court of Appeals, which he submitted in support of his habeas petition:

At trial, Officer Amil Alwan testified that, on October 31st at about 1:40 a.m., he went to 617 Potter Street, where he spoke with Mr. Keeler regarding a "shots fired" report (II Tr 205). During the interview, he heard a shot (II Tr 208). The witness went toward the sound at the corner of Potter and Walnut (II Tr 208). He heard another shot and saw a muzzle flash at 431 West Walnut. He saw a white male jump through a window; the man yelled, "'he's got a gun'" (II Tr 210). Other officers arrived and surrounded the house. A SWAT team arrived and entered the house. He heard a "flash-bang," then heard a gunshot; a short time later, a suspect was in custody.

Officer Anthony Dixon testified that he went to 431 West Walnut; he observed the home from a neighboring home. He saw a man with a gun. He saw the SWAT team arrive, and a "flash-bang" grenade go off. He heard someone cry "'I'm going

to die'" several times (II Tr 242). He heard what he thought were two gunshots (II Tr 243).

Jarrod Keeler testified that he lived at 617 Potter Street. On Halloween night, he got home at about 1:30-1:40 a.m. A man approached him outside; the man was wearing a gangster-type outfit, mask, and hat. They talked. The man pulled a gun and put it to the witness's head; he then raised it and fired it in the air twice, then left (II Tr 260, 263). Later, the witness heard what sounded like more gunshots.

Christopher Bradley testified that he lived at 431 West Walnut, which was divided into several apartments (rooms) and some common areas. On October 31st, he heard a loud bang outside (II Tr 279). He then heard a noise in the hallway. He opened the door and saw someone in a costume holding a "revolver-type" gun. The man told the witness to get down on the floor and he did (II Tr 286). The man then banged on Fred's door; it was opened and closed in a "second". The man told Fred to open the door or he would kill his friend (II Tr 292). The man then shot at the door twice (II Tr 293-294). Fred said the lock was jammed, then that he saw the police coming (II Tr 296). The man went into the witness's [sic] room and asked if there was another way out of the house (II Tr 296). The witness told him that he had to go back downstairs to get out. The man looked in the other rooms and went down the stairs. The witness went into his room, locked the door, and called 911 (II Tr 298). He heard tapping on a door and heard voices. An unknown voice told him that he knew he was on the phone to police and to hang up the phone. He hung up, but the police called back. The unknown voice became louder and profane. He hung up the phone again (II Tr 304). He heard a loud bang, like a "flash grenade" (II Tr 307). Police kicked his door in and he was taken outside. The man did not point the gun at the witness (II Tr 319).

The parties stipulated to admit the laboratory report regarding the gun and shell casings. Freddie Smith testified that he lived in an apartment on the second floor at 431 West Walnut. On October 31st, he was awakened by a knock on his door. He opened the door and saw a man in a mask with a revolver. He slammed the door shut. A shot came through the door (II Tr 327). The witness went out the window onto the roof (II Tr 328). He saw police officers all around the house. A SWAT team put a ladder up and he climbed down.

James Honz testified that he lived at 431 Walnut in an upstairs apartment. Shots woke him up. He heard a voice in the hallway say, "'he shot the guy downstairs'" (II Tr 343). He knocked on Chris's [sic] door; Chris told him to go back to his room and stay there (II Tr 345). He heard something like an attempt to pick his door's lock. He opened the door and saw Defendant (II Tr 348). He had a gun and came into the witness's [sic] room. Defendant asked the witness if he was afraid to die and closed and locked his door. The man told the witness to kneel down and "say ready to meet you, Jesus" (II Tr 352). Police entered the house and tried to break down his door. Defendant said he was going to shoot the television; he fired a shot into the wall, then

fired a second shot (II Tr 359).  Defendant was in his room for about 45 minutes.  Defendant said that the witness was his hostage.  Defendant did not point the gun at the witness and let the witness leave the room.

Officer Kennedy Crawford testified that he entered the home and found the body of a white man who appeared dead from a gunshot wound to the chest (II Tr 378).  After the suspect was arrested, the witness drove him to headquarters; the suspect asked, "Is he dead"? (II Tr 386).

Officer Sean Gordon testified that he entered the home with the SWAT team.  He heard a man screaming, saying that he had a hostage and that "he'd kill him if we didn't leave" (II Tr 396).  He heard a gun fired.  Police tried unsuccessfully to ram the door down.  The man yelled that he would kill the police and kill the hostage.  The witness heard two more shots.  He began negotiating with the Defendant.  Defendant asked about the condition of the man downstairs.  The witness said he was fine; Defendant said that he shot him.  The witness stated that Defendant said something to the effect "that he had come after him but he wouldn't elaborate" (II Tr 403).  Defendant said that he lost his job and had a wife and three kids (II Tr 404).  He said that he had gone to some Halloween parties.  Defendant allowed Mr. Honz to come out of the room.  10-15 minutes later, Defendant came out.  Defendant did not have the gun.  Inside the room, the witness saw a gun and currency on a table.  Defendant was "distraught throughout the entire incident" (II Tr 414).  Defendant asked for a walkie-talkie so he could talk to his wife.  He threatened to kill himself.

Sergeant Timothy Kozal testified that he entered the home with the SWAT team.  He heard a person yelling, "'I'm going to kill him'" (II Tr 420).  He heard more shots.

Officer Michael Skurski testified that he found a "revolver speedloader" on Defendant's person in a search after his arrest (II Tr 445).

Detective Matt Schulz testified that he searched Defendant's apartment with his consent, and found ammunition, shell casings, and receipts for the purchase of a revolver on September 24th and ammunition and a speedloader on October 29th.

The parties stipulated to the introduction into evidence of the autopsy report.

Police lab specialist Karianne Thomas testified that a mask, hat, clothes, partial bullets, and casings were found in the basement of the home at 431 West Walnut.

Detective Michael Slancik testified that he interviewed Defendant after giving him *Miranda* warnings at the police station.  Defendant was asked about the incident on Potter Street; he said he was going to ask the man for money, there was a scuffle, and his gun was fired.  Defendant said that he must have asked the man for his wallet, and said, "'I must have tried to rob him'" (III Tr 523).  Defendant said that, on Walnut

Street, he saw a man on a porch (III Tr 525). Whatever the man said "set him off" (III Tr 526). Defendant went inside the house; the man told him "to get the fuck out of his house" (III Tr 526). Defendant pointed the gun at his chest and shot him (III Tr 526). Defendant went into the basement of the house where he found locked suitcases. He heard sirens. He said that he went downstairs "to look for something to steal" (III Tr 528). He went to the second floor of the house. He wanted the person to open his door, but he would not. He shot at the door. He had previously reloaded the gun. He could hear someone on the phone to 911; he told them to get off the phone or he would kill them (III Tr 529). Defendant said that he pointed the gun at Jim's head (III Tr 530). Defendant stated that, after he shot the man, "he looked around the house and it dawned on him that this wasn't a house that had money in it" (III Tr 532). Conditions in the house indicated that people "of low income" lived there (III Tr 532). The reason he went to the second story was to escape (III Tr 532). The witness was asked if Defendant said what "triggered" the events; he said:

> I mean other than earlier on him saying that he wanted money and that this was his plan to get money is to go out and what he called ask people for money or get money from people.

(III Tr 533).

A DVD of the interview with Defendant was admitted as People's Exhibit 82.

The witness testified that Defendant stated that he did not drink alcohol for eight years before that night. He said that he did not smoke crack, but that he did that night. He said that he had traded his vehicle for crack (III Tr 536-537). Defendant was not "overly intoxicated" (III Tr 537). He testified that Defendant's "idea was is [sic] that he was going to go out and rob somebody-get money from people was his exact words" (III Tr 538).

Laboratory technician Gerald Luedecking testified that, after his arrest, Defendant told him that his clothes and mask, and shell casings, were in the basement of the house. In the witness's opinion, the fatal shot was fired when Defendant was on the stairs above the level at which the victim was standing (III Tr 564).

The Court denied Defendant's motion for a directed verdict on the assault with intent to murder charges against two victims. The Court denied Defendant's request to instruct the jury on voluntary manslaughter (III Tr 598-600). The parties stipulated that the jury could view the DVD of the interview with Defendant which was not viewed during the trial (III Tr 604-605).

(Def.-Appellant's Br. on Appeal, 1-8, docket #1-2.) The jury found Petitioner guilty of first-degree felony murder, assault with a dangerous weapon, discharge of a firearm in a dwelling and six counts

of felony-firearm. He was acquitted of premeditated murder and the three charges of assault with intent to murder.

### B. Direct Appeal

Petitioner appealed as of right in the Michigan Court of Appeals, raising the following claims of error:

> I. DID THE TRIAL COURT ERR REVERSIBLY BY DENYING DEFENDANT'S REQUEST FOR JURY INSTRUCTIONS ON VOLUNTARY MANSLAUGHTER AS A LESSER INCLUDED OFFENSE OF MURDER?
>
> II. WAS DEFENDANT DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL BY THE ATTORNEY'S ERROR IN FAILING TO REQUEST THE COURT TO INSTRUCT THE JURY ON SECOND-DEGREE MURDER AS A NECESSARILY INCLUDED LESSER OFFENSE OF FELONY-MURDER?
>
> III. WAS DEFENDANT DEPRIVED OF A FAIR TRIAL BY PLAIN ERROR BY THE INTRODUCTION OF DEFENDANT'S STATEMENT TO POLICE TO PROVE FELONY-MURDER WHERE INADEQUATE EVIDENCE THAT THE MURDER OCCURRED IN THE COURSE OF AN ATTEMPTED LARCENY WAS ADMITTED TO ESTABLISH THE *CORPUS DELICTI* OF FELONY-MURDER PRIOR TO THE ADMISSION OF DEFENDANT'S STATEMENT?

(Def.-Appellant's Br. on Direct Appeal, docket #1-2.) In an opinion issued on March 22, 2007, the Michigan Court of Appeals affirmed Petitioner's convictions. (MCOA Op., docket #1-2.) Petitioner sought leave to appeal in the Michigan Supreme Court, raising the same three claims raised before and rejected by the court of appeals. The supreme court denied his application for leave to appeal on September 10, 2007.

### C. Post-Conviction Proceedings

On January 22, 2008, Petitioner filed a motion from relief from judgment in the Kalamazoo County Circuit Court pursuant to MICH. CT. R. 6.500 *et seq.*, raising the following claim:

I.     WAS DEFENDANT DENIED DUE PROCESS OF LAW WHERE A DVD OF HIS CONFESSION WAS VIEWED SOLELY BY THE JURY OUTSIDE THE PRESENCE OF DEFENDANT.

The trial court denied his motion on February 22, 2008. The Michigan Court of Appeals and the Michigan Supreme Court denied his application for leave to appeal on June 20, 2008 and November 25, 2008, respectively, on the ground that Petitioner failed to meet the burden of establishing entitlement to relief under 6.508(D).

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the

decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

## Discussion

### A. Failure to Instruct on Lesser Included Offense

Petitioner contends that the trial court violated his Fourteenth Amendment due process and equal protection rights when it denied Petitioner's request for an instruction on voluntary

manslaughter as a lesser offense of first-degree murder. On appeal, the Michigan Court of Appeals held that the trial court's refusal to give the instruction was not an abuse of discretion, stating:

> Defendant first argues that the trial court erred in declining to instruct the jury on the lesser offense of voluntary manslaughter, pursuant to CJI2d 16.9. We disagree. We review de novo claims of instructional error. *People v Fennell*, 260 Mich App 261, 264; 677 NW2d 66 (2004). However, we review for an abuse of discretion a trial court's determination whether a jury instruction is applicable to the facts of a case. *People v McKinney*, 258 Mich App 157, 163; 670 NW2d 254 (2003).
>
> A requested instruction on a necessarily included lesser offense is proper if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense, and a rational view of the evidence would support it. *People v Cornell*, 466 Mich 335, 357; 646 NW2d 127 (2002). The sole element distinguishing manslaughter from murder is the absence of malice, *People v Holtschlag*, 471 Mich 1, 21; 684 NW2d 730 (2004), and proof of voluntary manslaughter requires a showing of adequate provocation as "the circumstance that negates the presence of malice." *People v Mendoza*, 468 Mich 527, 535-536; 664 NW2d 685 (2003). "[A]ny special traits of the particular defendant cannot be considered," and "[t]he fact that [the] defendant may have had some mental disturbance is not relevant to the question of provocation." *People v Sullivan*, 231 Mich App 510, 519-520; 586 NW2d 578 (1998). Rather, adequate provocation must be a sufficient stimulus to "cause a reasonable person to lose control." *Id.*, 518. Here, at most, defendant asserted that the victim "set him off" and "came at him," after defendant had wrongfully entered the victim's house with a gun. We are unable to perceive anything in the record hinting at anything the victim might have done that would have caused an ordinary, reasonable person to act out of passion instead of reason. The trial court's refusal to give a voluntary manslaughter instruction was proper.

(MCOA Op. 1-2.)

The Sixth Circuit Court of Appeals, sitting en banc, has held that the failure to give an instruction on a lesser-included offense, even when requested by counsel, is not of the "character or magnitude which should be cognizable on collateral attack." *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (en banc). The *Bagby* Court held that failure to instruct on lesser-included offenses in a noncapital case is reviewable in a habeas corpus action only if the failure results in a miscarriage of justice or constitutes an omission inconsistent with the rudimentary demands of fair procedure.

*Id.*; *accord Tegeler v. Renico*, 253 F. App'x 521, 524 (6th Cir. 2007); *Todd v. Stegal*, 40 F. App'x 25, 28-29 (6th Cir. 2002); *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002); *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001); *Samu v. Elo*, 14 F. App'x 477, 479 (6th Cir. 2001); *Williams v. Hofbauer*, 3 F. App'x 456, 458 (6th Cir. 2001). Shortly after the Sixth Circuit decision in *Bagby*, the Supreme Court emphasized that the fact that an instruction was allegedly incorrect under state law is not a basis for habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983)). Instead, the only question on habeas review is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 14 (1973)), *cited in Todd*, 40 F. App'x at 29. Here, there is no miscarriage of justice or fundamental defect in due process. As the state Court of Appeals correctly found, Petitioner was not entitled to a voluntary manslaughter instruction under state law, because there was no evidence of legal provocation by the victim. Furthermore, even if state law allowed such an instruction, no clearly established Supreme Court authority requires lesser-included offense instructions in non-capital cases. Thus, under the AEDPA, 28 U.S.C. § 2254(d)(1), this claim is not a basis for habeas relief. *Todd*, 40 F. App'x at 28 (citing *Estelle*, 502 U.S. at 71-72)).

### B.        Ineffective Assistance of Counsel

In his second ground for habeas corpus relief, Petitioner claims that his trial counsel was ineffective for failing to request the court to instruct the jury on second-degree murder as a lesser included offense of felony-murder. Because the trial court refused Petitioner's request to instruct the jury on voluntary manslaughter, defense counsel argued during closing arguments that the appropriate verdict on the murder charge was second-degree murder.  (IV Tr 627, 631-32). According to Petitioner, the trial court instructed the jury on second-degree murder as a lesser offense

of first-degree premeditated murder, but did not inform the jury that second-degree murder also is a lesser included offense of felony-murder. In addition, Petitioner alleges that the jury's verdict form did not include second-degree murder as a lesser offense of felony-murder and failed to note that felony-murder was first-degree murder.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

In rejecting Petitioner's claim of ineffective assistance of counsel, the Michigan Court of Appeals stated:

Defendant additionally argues that he was denied the effective assistance of counsel by his attorney's failure to request the trial court to instruct the jury on second-degree murder as a lesser included offense of felony murder. We perceive no merit to this argument, because defendant's contention that the jury was not instructed on second-degree murder as a lesser offense of felony murder is simply mistaken. A review of the record reveals that, while defense counsel did not specifically request such an instruction on the record, the jury was instructed on second-degree murder as a lesser offense of felony murder. Accordingly, no error should be imputed to defense counsel for failing to request a jury instruction on second-degree murder as a lesser offense of felony murder when it was already included in the instructions as given. *See People v Snider*, 239 Mich App 393, 425; 608 NW2d 502 (2000). Defense counsel was not ineffective for failing to make a superfluous request. *See People v Matuszak*, 263 Mich App 42, 57-58; 687 NW2d 342 (2004). We agree that the jury verdict form was not a model of clarity, and it could have been improved if second-degree murder was listed as an optional lesser charge after both first-degree premeditated murder and first-degree felony murder. However, defendant was not entitled to a perfect trial, only a fair one, and juries are presumed to follow their instructions. *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). The jurors here were clearly given detailed verbal instructions specifying that second-degree murder was an option. Defendant has failed to show that any arguable errors made by counsel prejudiced him.

(MCOA Op. 2.)

The Michigan Court of Appeals found that, contrary to Petitioner's assertion, the trial court instructed the jury that second-degree murder was a lesser included offense of felony murder. The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). In his application for habeas corpus relief, Petitioner does not dispute the court of appeals' finding of fact. Counsel cannot be faulted for failing to request an instruction that already was given by the

trial court. *See Jacobs v. Sherman*, 301 F. App'x 463, 470 (6th Cir. 2008) (failing to make a futile motion is neither unreasonable nor prejudicial).

Even if counsel were objectively unreasonable in failing to seek clarification on the verdict form that second-degree murder was a lesser included offense of both premeditated murder and felony-murder, Petitioner cannot show that he was prejudiced by counsel's omission. With regard to the prejudice prong of the *Strickland* test, the Supreme Court stated that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The prejudice prong "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Because the jury was instructed that second-degree murder was a lesser included offense of felony murder and second-degree murder was included as an option on the verdict form, Petitioner cannot show a reasonable probability that counsel's error changed the outcome of the trial. Consequently, this Court cannot find that the decision of the Michigan Court of Appeals is not an unreasonable application of *Strickland*. Petitioner, therefore, is not entitled to habeas corpus relief on his claim of ineffective assistance of counsel.

### C. *Corpus Delicti* Rule/Sufficiency of the Evidence

In Ground III, Petitioner argues that his statement to police should not have been received into evidence, because of the prosecutor's failure to first present independent evidence of every element of the crime as required by Michigan's "*corpus delicti* rule." He contends that in the absence of the improperly admitted statement, the remaining evidence is insufficient to sustain a finding of guilt of felony-degree murder beyond a reasonable doubt. Petitioner further argues in his

fourth ground for habeas relief, that his due process rights were violated because there was insufficient evidence to support the underlying felony of larceny.[1]  Specifically, Petitioner asserts that his statement to police that "he must have been going to rob him" is insufficient to support the underlying felony of larceny where he was profoundly high on mind-altering chemicals at the time of the murder and was trying to make sense of the events when he was talking to police.

The Michigan Court of Appeals found no violating of the *corpus delicti* rule, stating:

The term "corpus delicti" refers not to the dead body, but "instead to the body (corpus) of the wrong (delicti,) 'the loss sustained.'" *People v Williams*, 422 Mich 381, 390; 373 NW2d 567 (1985). The corpus delicti rule is intended to prevent a person from being convicted of a crime that was not actually committed by anyone; in a homicide case, the prosecution must show, "independent of the defendant's statement, that the named victim is dead as a result of some criminal agency," the purpose being "to preclude, conviction for a criminal homicide when none was committed." *Id.*, 388. The parties stipulated to the admission of the autopsy report, which, when combined with the witness testimony, clearly established without reference to defendant's confession that the victim died because defendant shot him in the chest. This clearly establishes the corpus delicti of homicide: a death by a criminal agency. That being the case, the rule does not additionally require "independent proof of each and every element of the particular grade and kind of common-law or statutory criminal homicide charged as a condition of admissibility of a defendant's confession." *Id.*, 391. There is no possibility here that defendant

---

[1]Petitioner's fourth ground for relief challenging the sufficiency of the evidence was not among the issues raised in his direct appeal or in his motion for relief from judgment. Because Petitioner did not fairly present the issue in the Michigan appellate courts, it is unexhausted. See *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *Duncan v. Henry*, 513 U.S. 364, 365 (1995). Exhaustion is only a bar to habeas consideration, however, if there is a state court remedy available for petitioner to pursue, thus providing the state courts with an opportunity to cure any constitutional infirmities in the state court conviction. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). Petitioner does not have an available state-court remedy because he already filed his one allotted motion for relief from judgment. *See* MICH. CT. R. 6.502(G)(1). Consequently, the issue is procedurally defaulted. The Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

might have been convicted of a homicide that was not, in fact, committed. Although "it is surely critical to a defendant" what degree of homicide he is convicted of, that question is outside the scope of the protection the corpus delicti rule is intended to provide. *Id.*, 391-392.

Defendant nevertheless asserts that, because he was convicted of felony murder predicated on the commission of a larceny, the corpus delicti rule requires additional proof, again independent of his confession, of larceny. That is contrary to the law in this state. *People v Hughey*, 186 Mich App 585, 588-589; 464 NW2d 914 (1990); *People v Emerson (After Remand)*, 203 Mich App 345, 348; 512 NW2d 3 (1994). Defendant impliedly urges us to conclude that these cases were wrongly decided. Although it is true, as the *Emerson* Court noted, that a given defendant might confess to *any* felony that did not actually happen just as much as to a nonexistent homicide, we remain convinced that the corpus delicti rule does not require what defendant asks. The "loss suffered" in *any* homicide remains that some person lost his or her life because of a criminal act. The rule does not require independent proof of the aggravating circumstances that increase the classified degree of the essential crime and that warrant more severe penalties. *Williams, supra* at 391.

Felony murder is an established common-law murder that is *elevated in degree* to a first-degree classification *for punishment purposes* because it took place while the defendant intended to commit an enumerated other felony. *People v Jones*, 209 Mich App 212, 215; 530 NW2d 128 (1995); *People v Brannon*, 194 Mich App 121, 125; 486 NW2d 83 (1992); see also *Williams, supra* at 388 n 3. Therefore, as *Hughey* concluded, the underlying felony, for the purpose of a felony murder charge, constitutes an aggravating circumstance affecting the homicide charge, not an independent matter requiring independent application of the corpus delicti rule. The prosecution satisfied the corpus delicti rule for homicide by establishing, without resort to defendant's confession, that a death had occurred by a criminal agency; the prosecution then properly used defendant's confession to elevate the homicide to first-degree felony murder. *People v Cotton*, 191 Mich App 377, 389-390; 478 NW2d 681 (1991).

(MCOA Op. 2-3.)

The so-called *corpus delicti* rule has its origin in the English common law of the 18th century. *See* VII WIGMORE, EVIDENCE § 2070 at 508-10 (Chadbourn Rev., 1978). In its purest form, the rule prevents conviction of a defendant in a homicide case on the basis of his uncorroborated confession alone. *Id.* According to Professor Wigmore, the rule was imported into this country as a result of Professor Greenleaf's evidence treaty, published in 1842. WIGMORE, § 2071 at 511.

Courts in this country adopted at least two versions of the rule. The minority required only that the confession be corroborated by evidence tending to show that the confession was trustworthy. *Id.* at 511. The stricter, majority rule required that the "*corpus delicti*" of the crime be established by evidence *aliunde* the confession before the confession became admissible. *Id.* at 516. This generally required production of some evidence on each of the essential elements of the crime as a prerequisite to admission of the confession. *Id.*

The *corpus delicti* rule found its way into the common law of the State of Michigan. Early cases seem to vacillate between the minority and majority iterations of the rule. For example, in *People v. Mondich*, 208 N.W. 675 (Mich. 1926), the court held that the *corpus delicti* rule was satisfied by proof, independent of defendant's statement, that the victim was dead as a result of some criminal agency. By contrast, other early cases held that the *corpus delicti* was not established until the prosecution showed all the elements of the offense by evidence extrinsic to the confession. *See*, *e.g.*, *People v. Paton*, 279 N.W. 888 (Mich. 1938). In its last major decision in the area, the Michigan Supreme Court adopted the less stringent view, holding that the *corpus delicti* rule is satisfied in a homicide case by independent evidence showing that the named victim is dead as a result of some criminal agency. *People v. Williams*, 373 N.W.2d 567, 570-72 (Mich. 1985). The *Williams* court pointed out that the historic purpose of the *corpus delicti* rule was to guard against conviction for a criminal homicide when none was committed, and that this goal was served by a showing that the victim's death was a homicide. *Id.* at 570. In *People v. McMahan*, 548 N.W.2d 199, 201 (Mich. 1996), the state supreme court adhered to its version of the rule, declining the prosecution's invitation to adopt the more lenient "trustworthiness" rule applied in federal criminal prosecutions.

It should be patent from the foregoing discussion that the *corpus delicti* rule is a principle of state common law with no constitutional underpinnings. The rule has been abandoned

altogether in the federal system since 1954.  In the companion cases of *Opper v. United States*, 348 U.S. 84 (1954), and *Smith v. United States*, 348 U.S. 147 (1954), the Supreme Court rejected the traditional *corpus delicti* doctrine, holding instead that confessions and admissions must be corroborated "by substantial independent evidence which would tend to establish the trustworthiness of the statement."  348 U.S. at 93.  On the basis of *Opper* and *Smith*, the circuit courts of appeals now uniformly consider the traditional *corpus delicti* rule to be abrogated in federal prosecutions.  *See, e.g.*, *Government of Virgin Islands v. Harris*, 938 F.2d 401, 408-10 (3d Cir. 1991); *United States v. Kerley*, 838 F.2d 932, 939-40 (7th Cir. 1988) ("The *corpus delicti* rule no longer exists in the federal system.").  In cases in which it is still applied, courts treat the *corpus delicti* rule as one governing "the admissibility of evidence, not the sufficiency of evidence to convict."  *Harris*, 938 F.2d at 409 n.6 (applying Virgin Islands law); *see Martin v. United States*, 335 F.2d 945, 951 (9th Cir. 1964) (*corpus delicti* rule governs only order of proof, a matter within the court's discretion).

The Michigan supreme court decision in *McMahan* should remove any doubt that the Michigan *corpus delicti* doctrine is a rule of state common law, and not a federal constitutional principle.  459 N.W.2d at 1201.

The federal courts may issue a writ of habeas corpus to release a state prisoner only on the ground that he is in custody in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a).  Accordingly, a petition states a claim for federal habeas relief only if it alleges that petitioner is in custody in violation of a federally guaranteed right.  *See Mabry v. Johnson*, 467 U.S. 504, 507 (1984).  The Supreme Court has held that federal habeas relief is not available for alleged errors in the admission of evidence or in other issues governed by state law.  *Estelle*, 502 U.S. at 71-72.  The Sixth Circuit clearly does not consider alleged violation of Michigan's *corpus delicti* rule to be an issue of constitutional magnitude sufficient to support habeas corpus relief.  *See*

*Williams v. Lecureux*, No. 92-2476, 1993 WL 445090, at *1 (6th Cir. Nov. 2, 1993) (*corpus delicti* issue is "purely state law" question not reviewable in habeas); *Chambers v. Jago*, No. 86-3913, 1987 WL 37568 (6th Cir. June 2, 1987) (*corpus delicti* rule not constitutionally mandated); *Templeton v. Foltz*, No. 85-1223, 1986 WL 18450, at *1 (6th Cir. 1986) (district court "correct in its conclusion that the *corpus delicti* rule is a creature of state law and does not carry with it implications of violation of federal constitutional law").

In summary, no holding of the Supreme Court has ever applied the *corpus delicti* rule to the states as a matter of federal constitutional law. To the contrary, the Court has held that issues of state substantive criminal law or procedure are insufficient to warrant habeas relief. *See e.g., Estelle*, 502 U.S. at 67-69. Petitioner's attempt to present an alleged *corpus deliciti* violation as a matter of federal due process is completely unavailing, as the Supreme Court has never said that the Due Process Clause guarantees any rights in this area. Application of the state *corpus delicti* rule on habeas review would be error, as the habeas court is limited to a review of the sufficiency of the evidence under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), not ancillary state evidence rules.

To the extent Petitioner asserts that there was insufficient evidence to support his conviction under *Jackson v. Virginia*, his claim is without merit. *Jackson* provides the standard for reviewing a § 2254 challenge to the sufficiency of the evidence which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319. This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*,

506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence to support Petitioner's conviction for first-degree felony murder. The elements of first-degree felony murder are: (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of a felony enumerated in MICH. COMP. LAWS §750.316(1)(b), which includes larceny. *People v. Bobby Smith*, 733 N.W.2d 351, 365 (Mich. 2007). It is undisputed that Thomas Bowman died from a gunshot to the chest inflicted by Petitioner. The existence of Petitioner's intent to commit murder can be inferred from his intentional discharge of his firearm at Bowman. *People v. Bulls*, 687 N.W.2d 159, 165 (Mich. Ct. App. 2004) (malice may be inferred from the use of a deadly weapon).

Finally, Bowman was killed during an attempted larceny, satisfying the third element of felony murder. MICH. COMP. LAWS § 750.316(1)(b). The elements of larceny are (1) an actual or constructive taking of goods or property, (2) a carrying away or asportation, (3) the carrying away must be with a felonious intent, (4) the subject matter must be the goods or personal property of another, (5) the taking must be without the consent and against the will of the owner. *People v. Cain*, 605 N.W.2d 28, 43 (Mich. Ct. App. 1999). "[A]n 'attempt' consists of (1) an attempt to commit an offense prohibited by law, and (2) any act towards the commission of the intended offense." *People v. Thousand*, 631 N.W.2d 694, 701 (Mich. 2001).

The circumstances surrounding the shooting suggest that Petitioner intended to take property from Bowman.  With regard to the incident on Potter Street when Petitioner put a gun to Jarrod Keeler's head and then fired shots into the air, Petitioner stated during his interview with police that "I must have tried to rob him."  (III Tr 523).  With regard to the events that occurred at 431 W. Walnut Street, Petitioner told Detective Slancik that he went to the basement to "look for something to steal."  (III Tr 528).  Petitioner further stated that after he shot the man, "he looked around the house and it dawned on him that this wasn't a house that had money in it."  (III Tr 532).  When asked by Detective Snancik what triggered Petitioner's conduct, Petitioner answered that his plan was to go out and get money from people.  (III Tr 533).  Furthermore, Petitioner took action toward the commission of the intended offense by purchasing a revolver on October 24 and purchasing ammunition and a speedloader on October 29.  In light of his statement to police, a reasonable juror could infer that Petitioner shot Bowman during an attempted larceny.  Because there was sufficient evidence to prove that Petitioner attempted to commit larceny against Bowman, the predicate offense has been established and a reasonable jury could have found Petitioner guilty of felony murder.

### D.    DVD of Petitioner's Statement to Police

In his final ground for habeas corpus relief, Petitioner claims that his Fourteenth Amendment due process rights and his Sixth Amendment right to be confronted with the witnesses against him were violated when the DVD containing his statement to police was not played during the presentation-of-evidence portion of the trial, but later was played for the jury during their deliberations.  Petitioner, who has never seen the DVD, believes that it shows both that he was still very high on drugs and alcohol when he made the statement and that he made the statement that "he must have been trying to rob him," not because he recalled that he, in fact, intended to rob Bowman,

but because he was trying to make sense of the shooting. Petitioner further claims that his trial counsel was ineffective for failing to object to the submission of the DVD to the jury and that his appellate counsel was ineffective for failing to raise the issue on direct appeal.[2]

While the DVD was not played during the presentation-of-evidence portion of trial, it was admitted into evidence during the prosecutor's case-in-chief and Detective Slancik gave detailed testimony regarding Petitioner's statements during the interview. More importantly, according to the statement of facts contained in Petitioner's appellate brief, the parties stipulated to allow the jury to watch the DVD during their deliberations. Because defense counsel agreed to allow the jury to watch the DVD, Petitioner effectively waived any argument that the jury's use of the DVD during deliberations violated his constitutional rights. Moreover, Petitioner cannot show that he was prejudiced by the jury's use of the DVD during deliberations. The DVD was cumulative of Detective Slancik's testimony. Further, if as Petitioner believes, the DVD shows that he was very high on drugs and alcohol and was just trying to make sense of the events when he said that "he must have been trying to rob him," that would seem to support Petitioner's theory that he had not formed the intent to commit larceny. Petitioner, therefore, cannot establish a due process violation arising from the jury's use of the DVD.[3]

_____

[2]While Petitioner raised the claim concerning the DVD in his motion for relief from judgment, he did not fairly present his claims of ineffective assistance of trial and appellate counsel. Thus, for the reasons previously noted, Petitioner's claim is procedurally defaulted. Even if Petitioner had raised his claims of ineffective assistance of counsel in his motion for relief from judgment, they still would be procedurally defaulted because the Michigan appellate courts relied upon MICH. CT. R. 6.508(D) in denying Petitioner's applications for leave to appeal. As discussed above, the Court Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default and proceed to the merits of his claims. *See Cone*, 243 F.3d at 971; *Binder*, 198 F.3d at 178.

[3]Petitioner has moved for an order to compel production of the DVD by the state and for a stay of proceedings until the item is produced (docket #4). Because the use of the DVD at trial raises no arguable ground for relief, the motion will be denied as moot.

Petitioner also contends that his Sixth Amendment right to confrontation was violated when the DVD of his statement to police was not played in his presence during the trial, but only viewed by the jury during deliberations. No clear authority exists for the proposition that the Sixth Amendment guarantees a right to "confront oneself" at trial. *See, e.g., Torres v. Roberts*, 253 F. App'x 783, 787-88 (10th Cir. 2007) (holding that state supreme court's rejection of the petitioner's Sixth Amendment right to confront witnesses when it admitted at trial the statements he made to law enforcement officers was not an unreasonable application of law warranting federal habeas relief); *United States v. Brown*, 441 F.3d 1330, 1359 (11th Cir. 2006), *cert. denied*, 549 U.S. 1182 (2007) (holding district court did not violate Sixth Amendment by admitting defendant's out-of-court statement) (citing *United States v. Zizzo*, 120 F.3d 1338, 1354 (7th Cir. 1997)); *United States v. Moran*, 759 F.2d 777, 786 (9th Cir. 1985); *United States v. Rios Ruiz*, 579 F.2d 670, 676-77 (1st Cir. 1978); 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 802.05[3][d] at 802-25 (2d ed. 2005) (explaining "a party cannot seriously claim that his or her own statement should be excluded because it was not made under oath or subject to cross-examination")); *United States v. Lafferty*, 387 F. Supp.2d 500, 511 (W.D. Pa. 2005) ("Inherent in Justice Scalia's analysis in the *Crawford* opinion was the idea that the right of confrontation exists as to accusations of third parties implicating a criminal defendant, not a criminal defendant implicating herself."); *but see United States v. Gibson*, 409 F.3d 325, 338 (6th Cir. 2005) (implying admission of an out-of-court confession by defendant might raise confrontation problems under *Crawford v. Washington*, 541 U.S. 36 (2004)).

Even if the Sixth Amendment applied to Petitioner's own statement, his claim is without merit. Detective Slancik testified regarding Petitioner's statements during his interview with police and was subject to cross-examination by defense counsel. Moreover, as discussed above, his claim

is effectively waived because counsel stipulated to allow the jury to view the DVD during deliberations.

Petitioner's related claims of ineffective assistance of counsel also are without merit. Trial counsel's stipulation that the jury could view the DVD during deliberations did not fall below an objective level of reasonableness. The DVD was entered into evidence during the prosecutor's case-in-chief and Detective Slancik already had testified regarding Petitioner's statements during the interview, thus defense counsel had no legal grounds for objecting to the jury's access to the DVD during their deliberations. "When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). Because Petitioner fails to satisfy the first prong of *Strickland*, the Court need not address the issue of prejudice. Neverthless, Petitioner fails to allege how he was actually prejudiced by the jury's use of the DVD under the circumstances of this case.

Likewise, appellate counsel was not ineffective for failing to raise the issue on direct appeal. An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S.

259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.* at 289. Here, because Petitioner's claim is without merit, appellate counsel was not deficient for failing to raise it on appeal. *See Burton v. Renico*, 391 F.3d 764, 781-82 (6th Cir. 2004) (where claim of prosecutorial misconduct lacks merit, counsel is not ineffective in declining to raise issue on appeal); *Buell v. Mitchell*, 274 F.3d 337, 351 (6th Cir. 2001) ("Buell's appellate counsel was not deficient for failing to raise on direct appeal nonfrivolous claims after deciding as a matter of professional judgment not to raise those points.").

## Conclusion

In light of the foregoing, the Court will summarily dismiss Petitioner's application pursuant to Rule 4 because it fails to raise a meritorious federal claim.

### Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This Court's dismissal of Petitioner's action under Rule 4 of the Rules Governing § 2254 Cases is a determination that the habeas action, on its face, lacks sufficient merit to warrant service. It would be highly unlikely for this Court to grant a certificate, thus indicating to the Sixth Circuit Court of Appeals that an issue merits review, when the Court has already determined that the action is so lacking in merit that service is not warranted. *See Love v. Butler*, 952 F.2d 10 (1st Cir. 1991) (it is "somewhat anomalous" for the court to summarily dismiss under Rule 4 and grant a certificate); *Hendricks v. Vasquez*, 908 F.2d 490 (9th Cir. 1990) (requiring reversal where court summarily dismissed under Rule 4 but granted certificate); *Dory v. Comm'r of Corr. of the State of New York*, 865 F.2d 44, 46

(2d Cir. 1989) (it was "intrinsically contradictory" to grant a certificate when habeas action does not warrant service under Rule 4); *Williams v. Kullman*, 722 F.2d 1048, 1050 n.1 (2d Cir. 1983) (issuing certificate would be inconsistent with a summary dismissal).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment consistent with this Opinion will be entered.


Dated: August 7, 2009                    /s/ Paul L. Maloney                                    
                                         Paul L. Maloney
                                         Chief United States District Judge